## No. 14,910.

SMITH *v.* GVIRTZMAN.
(124 P. [2d] 926)

Decided April 13, 1942.

Mr. Thomas J. Warren, for plaintiff in error.

Mr. Jerome Smith, Mr. Waldo Riffenburgh, for defendant in error.

*In Department.*

Mr. Justice Bock delivered the opinion of the court.

This is an action for damages for trespass and conversion. Plaintiff alleged that he was engaged in the business of catching and marketing fish; that he was the lessee and in possession of a certain pond or reservoir which constituted his source of supply for fish; that defendant entered upon the premises without right, took fish from the reservoir and drained the water therefrom, all to his damage in the sum of three hundred dollars. The answer was a general denial. At the close of the evidence the court granted defendant's motion for a directed verdict and appropriate judgment followed.

The only question necessary for our determination is whether the trial court committed error in granting the motion for a directed verdict. This requires first a consideration of the pleadings. Plaintiff commingled in one count several causes alleging conversion of his fish and repeated trespasses upon his property, which resulted in the alleged damage. Defendant, failing to require plaintiff to state these causes separately, and filing the answer by way of general denial, should, therefore, have been prepared to meet all such causes. *Fulton Investment Co. v. Farmers Reservoir & Irrigation Co.*, 76 Colo. 472, 231 Pac. 61; *Crandall Realty & Securities Co. v. Tanquary*, 23 Colo. App. 564, 130 Pac. 1084.

As to the facts, we adopt in part what plaintiff calls "uncontradicted and unconflicting testimony," and which defendant accepts "as a reasonably fair statement of the facts," except as to a few corrections, to which we shall later refer. These facts are stated as follows: "Plaintiff was, on April 2, 1939, in the rightful possession of two fish ponds and premises adjacent to the same,ᐧ * * * the possession of which premises, ponds and fish rights * * * plaintiff had held under lease for a period of twenty years. He lived there when not in Denver, where his market was located. Plaintiff also leased several other Colorado lakes and was, and had been for fifty-two years, in the business of taking, storing and selling fish, principally carp. These fish were stored in the ponds, fed cooked grain, from two to three months, to increase their size and improve their flavor and then sold, mainly to people of the Jewish race, who required the fish to be alive when purchased and generally preferred them large. They were worth from ten to thirteen cents a pound at the ponds on April 2, 1939.

"At five o'clock in the morning on the day in question, plaintiff, accompanied by his helper, Fred Reffel, left his premises * * * bound for the Denver market with two truck loads of live fish which had been taken from the lower pond. When they left the premises the upper pond was full of water. Water was coming into it nicely and overflowing into the lower pond. In the upper pond were about three tons of fish. It had not been touched for two months and its condition, when left that morning, was such that no water could escape unless the gate was moved.

"People of the Jewish race, by custom if not by tenet, use fish in observing the Passover, a religious holiday, which fell on or about the day in question. The defendant had resided in Fort Collins thirty years, knew the plaintiff, the nature and location of plaintiff's business and that the storage ponds were located upon property in the possession and occupancy of the plaintiff. De-

fendant was of the Jewish race and on said day went to plaintiff's premises, between eight and nine o'clock in the morning to buy some live carp, and, not finding anybody there, went to the residence of one Deines who lived near by, arriving there about eight o'clock in the morning, and asked Deines to go down and get him some fish. Deines refused and defendant left in about fifteen minutes.

"Defendant then called on one La Rue, who also lived near by, and who was employed by the reservoir company as ditch rider but had no authority over plaintiff's ponds or fish, and asked La Rue 'to go down to Mr. Smith's (plaintiff's) place with him to get some fish.' Defendant, in his own car, then took La Rue to plaintiff's premises, choosing the route, without suggestion from La Rue. La Rue opened the gate in the fence and defendant drove his car in and parked it near or upon the dike or dam between the two ponds.

\* \* \* \* \*

"The upper pond would fill in about thirty hours and, with the headgate or outlet clear open, completely drain in about an hour and a quarter.

"When the defendant and La Rue first arrived at the pond it was full of water. La Rue went to plaintiff's house to see plaintiff, who was not there, and he later went back to get a dip net. When he returned water was running out of the outlet, and knowing it would drain the pond and kill the fish and so advising the defendant, he attempted to close the gate, although he knew nothing about it, and asked defendant if the water had stopped and defendant said 'Yes.' La Rue took two fish from plaintiff's pond for the defendant, put them in defendant's car and defendant then took La Rue home. Defendant gave La Rue twenty-five cents for his trouble and La Rue told defendant to settle with plaintiff for the fish. La Rue testified he did not see defendant touch the headgate, that he did not know whether or not defendant opened the headgate. No one

but the defendant was present at the pond when La Rue went to plaintiff's house. La Rue admitted conversations with plaintiff's attorney regarding the matter, but denied or did not remember what was said, except that he said 'it could have been done that way' (by defendant) and that he thought defendant or someone had done it in his absence. La Rue left the plaintiff's premises knowing that some water was still running out of the pond.

"The same morning, Virgil Taylor accompanied by his son, Dale, went to plaintiff's premises to see if they could fish on the lake that season and found no one there. Dale called attention to the fish which were 'moving around' and they watched them. At that time, around nine-thirty to ten o'clock, there was about a foot of water in the pond and bare sand clear out at the edges. They thought the behavior of the fish and condition of the pond natural. They then went in search of plaintiff on the far side of the lake, ran out of gas, secured enough to take them back to Fort Collins and on the way back noticed that the pond was almost dry. It was then between eleven-thirty and twelve o'clock. Large numbers of fish, weighing from three to six pounds, were in piles and covered the bottom of the pond.

"Taylor then noticed the Novak car (the Novaks were up from Denver to do some fishing), advised Mrs. Novak of the situation, called Mr. Novak from the lake and upon their return to the pond, Deines came along, and by means of sacks, an old sheepskin coat and sand they checked the flow of water as well as they could with the fish in the way. After lunch, Taylor took his family back to the pond to show them the 'biggest bunch of fish you ever set eyes on' and when they arrived the defendant and a Mexican (Joe Romero) were there. Defendant with Romero's help, who had no authority over plaintiff's fish, then took two more carp from plain-

tiff's pond and handed Mrs. Novak a quarter, who likewise had no authority over plaintiff's fish.

"Novak left for Denver about four o'clock and upon arrival told the Reffel boys the water was out of the pond and the fish were dying. Plaintiff sent Fred Reffel and his brother (now deceased) to the pond to do what they could to fix it. They got to the pond about nine o'clock that night and by truck light tried to stop the outflow. There was then about six inches of water in the pond and dead fish were piled around the gate. Some of the dead fish were removed that night and the rest the next morning. Altogether twelve hundred pounds of dead fish were taken from the pond. In about three days the remainder of the fish were taken to a larger pond near Denver and of these about thirty-seven hundred pounds were found dead three or four days later. All of the fish died as a direct result of the water being drained from the pond. A total of forty-nine hundred pounds of fish so died."

Referring now to the conflicting evidence, defendant testified that the twenty-five cents which he paid to La Rue was in payment for the fish, while La Rue testified that it was compensation for his trouble in going with defendant to the pond, and that he had no authority from plaintiff to sell any of his fish nor to go on plaintiff's premises. There also is a conflict on whether "La Rue left plaintiff's premises knowing that some water was still running out of the pond." Concerning this matter the following occurred on cross-examination of La Rue by counsel for plaintiff: "Q. Did you go and look to see whether it was stopped? A. I can't remember but I think I did, and I don't think there was any water running—it was a very little if any. There might have been a little water running but it was stopped enough so I figured it would not drain the lake." La Rue also testified that he did not know anything about the operation of the pond and the stopper in question, which he attempted to close after obtaining fish for defendant.

That the pond did drain, and a large number of fish did die by reason thereof, is uncontradicted. There also is conflicting evidence growing out of a conversation between plaintiff and La Rue in the presence of defendant, which conversation, according to plaintiff's testimony, was as follows: "I asked him, I says 'Mr. La Rue, did you sell this fellow some fish from my storage pond' and he just shook his head, and I says to him 'Now I want the truth in regard to it. I have got one man's word on it and I want you to tell me the truth,' and I says 'Did you pry that storage pond open,' and he says, 'Frank, we went by the house, and we tried to catch them fish with the net, and we couldn't catch them and we had to draw the storage pond down,' and he said that three or four times hand running."

■ There is other conflicting evidence, but it is immaterial where, as here, in the consideration of a motion for a directed verdict, all of plaintiff's evidence, even though disputed by defendant, and every legitimate inference therefrom, must be accepted as true. This principle is so well established in this jurisdiction that no authority in support thereof need be cited.

What, then, were the issues upon which the evidence was held by the court to be insufficient to sustain plaintiff's complaint?

■■ First. Trespasses upon the property of plaintiff by defendant, of which there were at least two—one with La Rue and the other with Romero. The evidence as to both was sufficient from which a jury could find that they were joint trespassers or agents of defendant. Neither one had any authority to go upon the premises to take fish from the pond. It is asserted that defendant had a right to be on the premises as an invitee to buy fish; but he did more than that, he took fish from the pond, as stated by La Rue, without payment therefor, and Smith said he never was paid by La Rue. Mrs. Novak, after urging by defendant, accepted twenty-five cents from him for the fish taken in the afternoon,

which she was without authority to sell, and Smith accepted this from her under protest. The evidence of plaintiff was at least sufficient to support a verdict of the jury for nominal damages. 63 C. J., p. 1035, §225. Moreover, defendant having accepted the benefit of the acts of both La Rue and Romero, with knowledge of everything that had taken place, is liable in trespass. 63 C. J. , p. 933, §72.

■ Second. It is clear that, taking the evidence of plaintiff as true, it was sufficient to require a submission to the jury of the question of damages for the fish which defendant had taken from the pond and converted to his own use. No one in authority sold him any fish or authorized him to take them from plaintiff's pond, and the latter was entitled to recover for the full value of the fish taken.

■■ Third. Was plaintiff's evidence sufficient to go to the jury on the issue of whether, in view of the trespass by defendant and his associates, defendant was liable for the value of the fish lost by the draining of the pond? The most of the evidence on this point was conflicting and circumstantial. Plaintiff left the pond at five o'clock in the morning, April 2, 1939. Between seven-thirty and eight o'clock that morning defendant first appeared at the pond, and not finding plaintiff, he first sought out one Deines, who refused to accompany him. He then induced La Rue to go with him; and when they reached the pond at about 8:30 o'clock a. m. it was full of water. La Rue's statement to plaintiff, made in the presence of defendant, that "we went by the house, and we tried to catch them fish with the net, and we couldn't catch them and we had to draw the storage down," is important. Its denial does not affect its evidentary value. The headgate, which served as an outlet for the pond, was disturbed by La Rue while he and defendant were the trespassers, and they knew nothing about its operation. Within two hours thereafter the water left in the pond was only a foot deep, and when they left the

premises there still was some water running out of it. The inference may legitimately be drawn from this evidence, that defendant and La Rue were the only persons who could have opened the headgate, resulting in the draining of the pond. For any acts of La Rue, as disclosed by the evidence, defendant was liable. *Meek v. Smith*, 59 Colo. 461, 462, 149 Pac. 627. Considering all of plaintiff's evidence, and the legitimate inferences to be drawn therefrom, corroborated as it was by the physical features presented, it was sufficient to warrant its submission to the jury on the question of liability for loss of the fish caused by the draining of the pond. Whether defendant is liable for exemplary damages depends upon whether the statutory prerequisites authorizing the allowance of such damages were present, as to which we express no opinion.

In the event of a new trial, for the purpose of clarifying the issues, we suggest that the parties, should they desire, be permitted to amend their pleadings.

The judgment is reversed and the case remanded, with directions to grant a new trial, and for further proceedings not inconsistent with this opinion.

MR. CHIEF JUSTICE YOUNG, MR. JUSTICE BAKKE and MR. JUSTICE KNOUS concur.